COURT OF APPEALS
SECOND 
DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-03-402-CR
 
  
HERBERT 
RONALD BOWDEN                                                  APPELLANT
  
V.
  
THE 
STATE OF TEXAS                                                                  STATE
  
  
------------
 
FROM 
THE 78TH DISTRICT COURT OF WICHITA COUNTY
 
------------
 
OPINION
 
------------
        Appellant 
Herbert Ronald Bowden was convicted by a jury of reckless injury to a child. The 
trial court sentenced him to ten years’ confinement in accordance with the 
jury’s assessment. In two issues on appeal, appellant contends that the 
evidence is legally and factually insufficient to support his conviction. 
Because we hold that the evidence is both legally and factually sufficient to 
support the jury’s verdict, we affirm.
Factual Background[1]
        This 
case involves a house fire in which two sisters, seven and eight years old, 
died. Appellant is the boyfriend of the girls’ mother, Sharan Williams;[2] the girls were spending the night in a vacant house where 
appellant was temporarily living until he could get an apartment. On the night 
of October 4, 2002, Sharan left the girls with appellant while she went out.
        The 
house where appellant and the girls were staying had no utilities or running 
water, so the girls were put to bed in a back bedroom with a candle in a pie 
plate on the floor between their bed and the wall. In the early morning hours of 
October 5, a fire started in the back bedroom while appellant claims he was 
asleep on the couch. The girls did not come out by themselves, and appellant 
tried to get them out of the room but could not. The State charged both 
appellant and Sharan with two counts of reckless injury to a child.
Legal and Factual Sufficiency Standards of Review
        In 
reviewing the legal sufficiency of the evidence to support a conviction, we view 
all the evidence in the light most favorable to the verdict in order to 
determine whether any rational trier of fact could have found the essential 
elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 
U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Ross v. State, 133 S.W.3d 
618, 620 (Tex. Crim. App. 2004). This standard gives full play to the 
responsibility of the trier of fact to resolve conflicts in the testimony, to 
weigh the evidence, and to draw reasonable inferences from basic facts to 
ultimate facts. Jackson, 443 U.S. at 319, 99 S. Ct. at 2789. The trier of 
fact is the sole judge of the weight and credibility of the evidence. See 
Tex. Code Crim. Proc. Ann. art. 
38.04 (Vernon 1979); Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. 
App. 2000). Thus, when performing a legal sufficiency review, we may not 
re-evaluate the weight and credibility of the evidence and substitute our 
judgment for that of the fact finder. Dewberry v. State, 4 S.W.3d 735, 
740 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000). We must 
resolve any inconsistencies in the evidence in favor of the verdict. Curry v. 
State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). The standard of review is 
the same for direct and circumstantial evidence cases. Burden v. State, 
55 S.W.3d 608, 613 (Tex. Crim. App. 2001); Kutzner v. State, 994 S.W.2d 
180, 184 (Tex. Crim. App. 1999).
        In 
reviewing the factual sufficiency of the evidence to support a conviction, we 
are to view all the evidence in a neutral light, favoring neither party. See 
Zuniga v. State, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004). The only 
question to be answered in a factual sufficiency review is whether, considering 
the evidence in a neutral light, the fact finder was rationally justified in 
finding guilt beyond a reasonable doubt. Id. at 484. There are two ways 
evidence may be factually insufficient: (1) the evidence supporting the verdict 
or judgment, considered by itself, is too weak to support the finding of guilt 
beyond a reasonable doubt; or (2) when there is evidence both supporting and 
contradicting the verdict or judgment, weighing all of the evidence, the 
contrary evidence is so strong that guilt cannot be proven beyond a reasonable 
doubt. Id. at 484-85. “This standard acknowledges that evidence of 
guilt can ‘preponderate’ in favor of conviction but still be insufficient to 
prove the elements of the crime beyond a reasonable doubt.” Id. at 485. 
In other words, evidence supporting a guilty finding can outweigh the contrary 
proof but still be insufficient to prove the elements of an offense beyond a 
reasonable doubt. Id.
        In 
performing a factual sufficiency review, we are to give deference to the fact 
finder’s determinations, including determinations involving the credibility 
and demeanor of witnesses. Id. at 481; Cain v. State, 958 S.W.2d 
404, 407 (Tex. Crim. App. 1997). We may not substitute our judgment for that of 
the fact finder’s. Zuniga, 144 S.W.3d at 482.
        A 
proper factual sufficiency review requires an examination of all the evidence. Id. 
at 484, 486-87. An opinion addressing factual sufficiency must include a 
discussion of the most important and relevant evidence that supports the 
appellant’s complaint on appeal. Sims v. State, 99 S.W.3d 600, 603 
(Tex. Crim. App. 2003).
        The 
sufficiency of the evidence should be measured by the elements of the offense as 
defined by the hypothetically correct jury charge for the case. Malik v. 
State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); Ortiz v. State, 
993 S.W.2d 892, 895 (Tex. App.—Fort Worth 1999, no pet.). Such a charge would 
be one that accurately sets out the law, is authorized by the indictment, does 
not unnecessarily restrict the State’s theories of liability, and adequately 
describes the particular offense for which the defendant was tried. Gollihar 
v. State, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); Malik, 953 
S.W.2d at 240. The law as authorized by the indictment means the statutory 
elements of the charged offense as modified by the charging instrument. See 
Curry, 30 S.W.3d at 404.
Elements of Offense
        Injury 
to a child is a result-oriented offense; thus, it is not enough for the State to 
prove that the defendant engaged in the conduct with the requisite criminal 
intent. Lee v. State, 21 S.W.3d 532, 540 (Tex. App.—Tyler 2000, pet. 
filed). Instead, the State must also prove that the defendant caused the result 
with the requisite criminal intent. Id. A person is criminally 
responsible if the result would not have occurred but for his conduct, operating 
either alone or concurrently with another cause, unless the concurrent cause was 
clearly sufficient to produce the result and the conduct of the actor clearly 
insufficient. Tex. Penal Code Ann. 
§ 6.04(a) (Vernon 2003).
        A 
person acts recklessly when he is aware of, but consciously disregards, a 
substantial and unjustifiable risk that the result will occur. Id. § 
6.03(c). The risk must be of such a nature and degree that its disregard 
constitutes a gross deviation from the standard of care that an ordinary person 
would exercise under all the circumstances as viewed from the actor’s 
standpoint. Id. Reckless conduct involves conscious risk creation; that 
is, the actor was aware of the risk surrounding his conduct or the result of his 
conduct, but consciously disregarded that risk. See Lewis v. State, 529 
S.W.2d 550, 553 (Tex. Crim. App. 1975). The culpable mental state is generally 
proven through circumstantial evidence. See Dillon v. State, 574 S.W.2d 
92, 94 (Tex. Crim. App. [Panel Op.] 1978).
Indictment
        In 
two counts, the indictment charged appellant with recklessly causing serious 
bodily injury to both girls “by leaving [them] in a room without adult 
supervision with a candle burning.” As part of our legal sufficiency review, 
we must review the evidence as authorized by the most recent valid indictment in 
the record. See Curry, 30 S.W.3d at 404. In this case, the original 
indictment did not allege how appellant recklessly caused serious bodily injury 
to the children. See Tex. Code 
Crim. Proc. Ann. art. 21.15 (Vernon 1989) (providing that whenever 
defendant is charged with recklessness in commission of offense, indictment must 
allege with reasonable certainty acts relied upon to constitute recklessness). 
The State filed a motion to amend the indictment, which in paragraph 2 quoted 
the charging language from the indictment with the addition of “by leaving 
[them] in a room without adult supervision with a candle burning” to the 
reckless injury to a child count. The trial court’s order granting the motion 
did not set forth the amended language in full but stated that the indictment 
was amended “as requested by the State in paragraph number two (2) of its 
Original Motion to Amend the Indictment.” Cf. Aguilera v. State, 75 
S.W.3d 60, 64 (Tex. App.—San Antonio 2002, pet. ref’d) (concluding that 
trial court order, which reproduced language of indictment with amending 
language included, effectively amended indictment); Valenti v. State, 49 
S.W.3d 594, 598 (Tex. App.—Fort Worth 2001, no pet.) (holding that physical 
interlineation on trial court order granting State’s motion to amend that 
reproduced original language of indictment was effective as amendment). The 
indictment was never physically interlineated or reproduced. See Riney v. 
State, 28 S.W.3d 561, 566 (Tex. Crim. App. 2000) (noting “that Ward v. 
State continues to stand for the proposition that ‘[n]either the motion 
[to amend] itself nor the trial judge’s granting thereof is an amendment; 
rather the two comprise the authorization for the eventual amendment of the 
charging instrument pursuant to Article 28.10'” and quoting Ward v. State, 
829 S.W.2d 787, 793 (Tex. Crim. App. 1992)). But appellant did not file a motion 
to quash the indictment, nor did he object when the indictment was read with the 
amending language included. In addition, appellant does not complain on appeal 
that the indictment was never amended or about any other defect in the 
indictment. See Robinson v. State, No. 2-02-462-CR, 2003 WL 22253856, at 
*1 n.2 (Tex. App.—Fort Worth Oct. 2, 2003, pet. ref’d) (mem. op.) (not 
designated for publication). In any event, we do not need to determine whether 
the indictment in this case was validly amended or not because our analysis is 
the same under either version of the indictment.[3]
Review of Evidence
        Appellant 
contends that the fire was merely accidental and that his act of falling asleep 
on the couch while the candle was burning in the room where the girls were 
sleeping was not reckless because it did not constitute a gross deviation from 
the standard of care.[4]  The State responds that 
there is evidence in the record that appellant was aware of the danger that fire 
might result from burning candles in the house and that the room where the girls 
slept was unsafe because it had trash on the floor and inadequate escape 
options.  The State further suggests that there is evidence in the record 
from which the jury could reasonably infer that appellant was not in the house 
when the fire started and was unavailable to assist the girls until it was too 
late.
        Zula 
Mae Scott, the girls’ grandmother, testified that the girls had lived with her 
since they were babies. Sharan sometimes stayed at Zula Mae’s house with them 
but not all the time; she was mostly “in and out.” Sharan had a key to Zula 
Mae’s house.
        When 
Zula Mae found out that appellant and Sharan had been taking the girls to spend 
the night at a vacant house, she told them it was too dangerous to be taking 
them there and lighting candles. She also said she talked to them about the 
house catching on fire. According to Zula Mae, Sharan said she always made sure 
to put the candles out before she went to sleep, and Zula Mae believed that if 
Sharan had been in the house that night, she would have done so.
        On 
the evening of October 4, Sharan was supposed to stay with the girls at Zula 
Mae’s house until Zula Mae came home from work. Neither the girls nor Sharan 
were home when Zula Mae came home at 5:30. She later learned that there had been 
a fire and the girls were dead.
        Lee 
Samuel Beatty lives on Dallas Street, a couple of houses down from the abandoned 
house, and was renovating the home next door. In a statement to police after the 
fire, Beatty said that the girls should never have been in the house, but at 
trial, Beatty equivocated, saying that “the house was fine to me as far as 
them being in that house. But, you know, some people may say maybe they 
shouldn’t have been there because the house was -- you know, didn’t have 
everything like water and stuff.” Beatty testified that on the night of the 
fire he heard “some noise like screaming, or yelling, or something,” then he 
heard glass breaking. He went outside because he thought someone was trying to 
break into a house and eventually saw appellant, who was upset.
        Beatty’s 
girlfriend, Brenda Strawn, testified next. On the night of the fire, she heard 
screaming and glass breaking. By the time she got outside, Beatty had already 
`been outside for about ten minutes. Strawn did not see Beatty at first, but she 
did see appellant, who was “like in shock or something” and not talking. He 
just shook his head when she asked him what was happening. She then saw Beatty 
trying to put out the fire. In a prior statement to police, Strawn had stated 
that she asked appellant if the girls were in the house, but he kept saying he 
did not know.
        Officer 
Jonathan Lindsay testified that he was the first emergency responder to the 
fire. When he arrived, the whole structure was in flames. He saw appellant in 
front of the house; appellant had a towel wrapped around one of his hands and 
said to Officer Lindsay, “[M]y babies are inside, my babies are inside.” 
Appellant was frantic, nervous, and scared. Officer Lindsay did not see any 
burns on appellant, nor did he remember appellant coughing.
        Joanna 
Burgan, a paramedic, testified that she went to check on someone she was told 
was appellant. Appellant was in a police car. She saw blood on his hand but did 
not treat him because he told her he was okay. Burgan did not notice any burns 
on appellant, nor did she hear him coughing. She did not listen to his lungs, 
however. According to Burgan, whether a person is suffering from smoke 
inhalation is usually determined by difficulty in breathing, mild coughing, and 
leaning forward while trying to take breaths. In her opinion, there was no need 
to treat appellant for smoke inhalation; however, she acknowledged she was not 
evaluating appellant’s respiratory system at the time. In response to 
cross-examination, Burgan admitted that some smoke inhalation damage can show up 
later and that some first degree burns do not appear until after a person is 
away from the heat source. Appellant’s counsel also elicited testimony that 
appellant has dark skin, it was dark outside, and the only light available was 
the overhead light in the police car.
        Sergeant 
Ginger Harrill interviewed appellant twice after the fire. The State admitted 
videotapes of the interviews, and a transcription of the interviews is included 
in the record.
        During 
appellant’s first interview, which took place about 4:00 a.m. the morning of 
the fire, appellant told Sergeant Harrill that he, Sharan, and the girls walked 
to the abandoned house from Zula Mae’s. The girls stayed at the house that 
night because Sharan wanted to go out. He said that he put the girls to bed in 
the back bedroom[5] about 7:30 or 8:00 p.m., lit a 
candle when it got dark, and then went to the couch in the front room[6] and fell asleep about 10:00. When appellant got up to 
check on the girls, the back room was on fire; flames were coming out the door 
between the front rooms and the back room, and he could not get in the back 
room. He went out the front door of the house, then around to the back where he 
knocked out the back bedroom window. A dresser was in front of the window, and 
he knocked it over. He also tried to get through a back exterior door to the 
bedroom, which had been nailed shut. That door was also obstructed by a chair. 
Appellant knocked the door down but could not get in.
        Appellant 
told Sergeant Harrill that before the fire that night he had gone a few houses 
down to Preston McFadden’s house for a cigarette, but he returned at 9:30 and 
checked on the girls, who were okay. He was gone only about a minute, and the 
candle was lit while he was gone. Sergeant Harrill told appellant that there 
were “neighbors that are saying you came walking down the alley was on fire 
[sic]” and that she needed appellant to tell the truth about whether he was 
gone when the house caught fire. Appellant answered “No.”
        In 
his second interview, which took place two days after the fire, appellant told 
Sergeant Harrill that McFadden woke him up “hollerin’” sometime after 
11:00 p.m. Appellant went out to talk to McFadden and was gone for about thirty 
seconds. After appellant went back inside, he checked on the girls and then fell 
asleep on the couch. He was not away from the house when the fire started. 
Appellant said he would not have left the girls alone because “[k]ids can’t 
. . . take care of” themselves. Appellant told Sergeant Harrill that he was 
awakened by the girls screaming. According to appellant, the girls had stopped 
screaming by the time he knocked out the window.
        Appellant 
told Sergeant Harrill that the room the girls were in had two interior doors to 
it; one was closed and the other one was open. The closed door[7] 
opened to the inside of the girls’ room and had no doorknob; thus, the girls 
could not have easily opened it from their room, and appellant would have had to 
push on it from outside the bedroom to open it. Appellant said that the bedroom 
the girls were in had “just a little trash on the floor.”
        At 
first, appellant said that he was the one who lit the candle, but then said he 
remembered Sharan lit the candle while he and Sharan were in the bedroom talking 
before Sharan went out that night. He said the candle was away from the bed and 
closer to the wall.
        Sergeant 
Harrill then testified that when she first interviewed appellant, he did not 
have on any shoes, which was consistent with his claim that he had been asleep 
when the fire started. Based on appellant’s drawing that he made for Sergeant 
Harrill during the interview, the couch where he claimed to be sleeping was only 
about sixteen feet away from the candle.
        Officer 
Ronald Bukowski testified after Sergeant Harrill. He confirmed that when he 
responded to the fire, appellant was upset and had a laceration on his hand. He 
didn’t remember if appellant had been coughing or whether he had any burns.
        Battalion 
Chief Lynn Holzer of the Wichita Falls Fire Department testified that the fire 
was accidental. By the time he arrived at the house, the fire was so strong that 
a person trying to go into the house would not “have lasted two or three 
seconds.” In response to cross-examination, he said that if a window had been 
broken in the early stages of the fire, it would have added more oxygen to the 
fire and could possibly have created a variation in air pressure that would have 
caused an open door to the bedroom to shut. He also confirmed that if a person 
is capable of screaming, the fire has probably not grown to the point where 
breathing the smoke and fire has damaged that person’s lungs. He stated 
further that if someone had attempted to open a door to the bedroom while it was 
on fire, that person would probably suffer some smoke inhalation damage and 
maybe have burned their hands. Battalion Chief Holzer also testified that the 
majority of home fires the department responds to are in homes with utilities 
and that a major concern for them is to make sure the utilities are turned off.
        The 
final witness at guilt-innocence was Jim Graham, the Assistant Fire Marshal for 
the Wichita Falls Fire Department. Graham described how he investigated the fire 
and came to his conclusions about the cause and origin of the fire. He concluded 
that the fire was started in the back bedroom by the accidental introduction of 
an open flame; based on appellant’s comments to him about the fire, he 
believed the fire was most likely started when clothing or a sheet came into 
contact with the candle, perhaps when one of the girls rolled over on the bed.
        Graham 
testified that based on the burn patterns on the wood, the front door of the 
house had been open during most of the fire, but the door between the front 
rooms and the back room where the girls were—the door that appellant claimed 
had been open—had been closed during most of the fire. He said he could not 
tell if someone had opened and shut the door briefly. He did state that if 
someone had tried to open the door when it was in flames, it probably would have 
collapsed. When he found the door, it had fallen off its hinges and part of it 
was broken, but the majority of it was still intact. When questioned about the 
lack of burns on appellant and the fact that appellant did not appear to have 
any smoke inhalation symptoms, Graham opined that that was not consistent with 
someone trying to open the door. Graham confirmed that the second door, the one 
without the doorknob, was closed during the fire.
        Graham 
opined that one of two scenarios was possible: either the fire was “fully 
involved” as appellant described it and appellant did not open the door to the 
bedroom, or appellant opened the door before conditions were as bad as appellant 
said and left the girls inside. Graham said he did not think anyone believed the 
second scenario. Graham also said that if appellant broke the back window when 
the fire was fully engaged, a backdraft explosion would have occurred, burning 
appellant. Graham could see no reason why the girls should not have been able to 
get out of the room unless the door between the back bedroom and the front rooms 
had been obstructed or locked. But Graham also stated that there was no way to 
tell if the door had been locked or obstructed. Graham thought the evidence was 
inconsistent with appellant opening the door to the bedroom. But Graham admitted 
there were no facts from the physical evidence showing that appellant was not in 
the house when the fire started and that appellant could have been inside. 
Graham did not think it possible that appellant’s breaking out the window 
could have caused the bedroom door to close. Graham also testified that it’s 
unlikely the girls would have been able to break and escape through the window 
by themselves and that they would “more than likely” have needed some 
assistance or direction to get out of the room. In addition, one of the girls 
“had enough carbon monoxide in her to have affected her ability to be able to 
escape or make any kind of decisions.”
        On 
cross-examination, Graham admitted that the majority of open-flame fires occur 
in homes with utilities and that a similar, albeit nonfatal, fire had occurred 
in Wichita Falls in a house that had electricity.
Analysis
        The 
evidence shows that appellant could have taken the girls back to Zula Mae’s 
house, a short walk away. He could have stayed in the room with the girls. Or he 
could have extinguished the candle if he did not want to stay in the room with 
them. Instead, knowing that using candles in the house could potentially start a 
fire, appellant chose to allow the girls to sleep alone in a room with a candle 
in a pie tin on the floor close to the bed in a house that he knew had no 
running water or other means of extinguishing a fire and in a room with a 
blocked window and only one working door, which the jury was free to believe was 
shut during the duration of the fire.[8]  Even if 
appellant was asleep on the couch approximately sixteen feet away from the 
bedroom as he claims,[9] the evidence shows that he 
was not able to assist the girls in escaping the fire and they died as a result.[10]   According to the assistant fire marshal’s 
testimony, the girls more than likely would have needed assistance to escape the 
room. Yet, appellant, knowing the risk that a fire could occur, left them 
unsupervised in the room with a burning candle. Thus, we conclude that this 
evidence is both legally and factually sufficient to show that appellant’s 
conduct in leaving the girls alone in the room with a burning candle constituted 
a “gross deviation from the standard of care that an ordinary person would 
exercise under all the circumstances as viewed from [appellant’s] 
standpoint.” Tex. Penal Code Ann. 
§ 6.03(c).[11]
        In 
addition, there is evidence from which the jury could have believed appellant 
was not in the house when the fire started. In her statement to police, Strawn 
stated that when she first encountered appellant outside the house (after 
hearing breaking glass), she asked him if the girls were in the house, and he 
said he did not know. In addition, there was testimony that had appellant 
attempted to enter the bedroom when he said he did, he most likely would have 
suffered burns or smoke inhalation, but no one at the scene detected any burns 
or symptoms of smoke inhalation on appellant. Appellant claimed that he was on 
the couch until he first noticed the fire, at which point he already saw flames 
coming out of the door to the bedroom. Yet assistant fire marshal Graham 
testified that appellant could not have been on the couch for any length of time 
as the fire burned. Finally, appellant’s statements were inconsistent about 
the times he left the house. In his first statement, he said he left only once. 
But in his second statement, he said he left twice, but the second time was only 
for about thirty seconds. In those thirty seconds, he claims to have had a 
conversation with Preston McFadden. Although we do not believe that these 
inconsistencies alone would support sufficient evidence to warrant a conclusion 
that appellant was not in the house when the fire started, the jury was entitled 
to consider these inconsistencies as proof of guilt in conjunction with 
Strawn’s testimony and the lack of burns on, or smoke inhalation symptoms of, 
appellant. See Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) 
(stating that inconsistent statements are probative of wrongful conduct and 
circumstances of guilt and acknowledging that “[e]ach fact need not point 
directly and independently to the guilt of the appellant, as long as the 
cumulative effect of all the incriminating facts are sufficient to support the 
conviction”); see also Tippitt v. State, 41 S.W.3d 316, 326 (Tex. 
App.—Fort Worth 2001, no pet.) (acknowledging that inconsistencies in the 
appellant’s statements to police were “factors that could have been 
considered by the jury in determining his guilt”). All of this evidence taken 
together supports a conclusion that appellant was not in the house when the fire 
started.
        This 
evidence is relevant as further evidence (in addition to the evidence detailed 
above) of the degree of appellant’s disregard of the appreciable risk of 
leaving the girls alone in the bedroom with the candle burning. We do not 
suggest that the record contains evidence showing that “but for” 
appellant’s being outside of the house, he would have been able to save the 
girls from the burning room, thus preventing their deaths. To the contrary, the 
evidence shows that once the fire started, it spread rapidly and reached 
flashpoint within a five to seven minute period. There is no evidence that 
appellant would have been able to save the girls even if he had been on the 
couch when the fire started. Thus, our conclusion is that there is sufficient 
evidence to show that appellant’s act of leaving the girls unsupervised in the 
room with the candle burning caused the girls’ deaths, not that appellant’s 
being out of the house when the fire started caused the girls’ deaths. But 
that evidence is circumstantial evidence relevant to appellant’s mental state 
(i.e., disregard of the risk) and as such is appropriate to discuss in our 
sufficiency review.
        We 
further conclude that the evidence of appellant’s awareness of the risk is 
factually sufficient. Zula Mae testified that she warned both appellant and 
Sharan that lighting candles in the house could cause a fire. This warning was 
in the context of her telling appellant and Sharan not to take the girls to the 
house where appellant was staying. The jury was free to believe Zula Mae’s 
testimony.
        This 
is a tragic case. While we may not necessarily have reached the same conclusion 
as the fact finder, we may not second-guess the jury. Accordingly, we hold, 
based on our review of the record and the appropriate standards of review, and 
giving appropriate deference to the jury as fact finder, that the evidence is 
both legally and factually sufficient to support appellant’s conviction for 
reckless injury to a child.
Conclusion
        Having 
determined that the evidence is both legally and factually sufficient to support 
the jury’s verdict, we overrule appellant’s issues and affirm the trial 
court’s judgment.
   
   
                                                          TERRIE 
LIVINGSTON
                                                          JUSTICE
 
 
PANEL 
F: LIVINGSTON, DAUPHINOT, and GARDNER, JJ.
 
PUBLISH
 
DELIVERED: 
May 26, 2005


ATTACHED DRAWING 
OF HOUSE

NOTES
1. 
Because we must review the entire record to determine appellant’s issues, a 
more thorough recitation of the evidence introduced at trial follows the 
standard of review below.
2. 
Sharan’s appeal is also before this court in cause number 02-03-472-CR.
3. 
We note that the amendment, if valid, would restrict the State’s theory of the 
case to proving that appellant recklessly caused serious bodily injury to the 
children by leaving them in the room unsupervised with a lit candle. We analyze 
the sufficiency of the evidence under this theory; however, we note that no 
other manner and means is raised by the evidence.
4. 
In his legal sufficiency issue, appellant does not challenge the sufficiency of 
the evidence to support the other elements of the offense: that appellant had 
responsibility for the children when they died, that the children suffered 
serious bodily injury, and that there is evidence of his awareness of the risk 
to the children. But in his factual sufficiency issue, he does appear to argue 
that the evidence of his awareness of the risk is weak.
5. 
A copy of a drawing of the house that appellant made during the interview is 
attached to this opinion. The drawing is oriented so that the southernmost parts 
of the house are closer to the top of the page and the northernmost parts are 
closer to the bottom. The back bedroom where the girls were sleeping is shown in 
the bottom right corner of the drawing.
6. 
The room shown in the upper left corner of the drawing, situated diagonally from 
the room the girls were sleeping in.
7. 
Shown in the drawing on the left side of the back bedroom.
8. 
Evidence of the proximity of the candle to the bed and the lack of an adequate 
escape route is relevant to the issue of causation—there is evidence that 
these things contributed to the fire that caused the girls’ deaths. But there 
is no evidence that these were the sole cause of the girls’ deaths or that 
appellant’s act of leaving the girls unsupervised with the candle in the room 
would have been insufficient to cause the girls’ deaths. See Tex. Penal Code Ann. § 6.04(a).
9. 
The thrust of appellant’s complaint on appeal is that his act of falling 
asleep was not a gross deviation from the standard of care. But the State did 
not contend that appellant’s falling asleep caused the deaths, rather that 
appellant recklessly caused the girls’ deaths by leaving them without adult 
supervision in the room with the candle burning.
10. 
Assistant fire marshal Graham testified that he did not think it would have made 
any difference which door or window appellant tried first in determining whether 
he could have rescued the girls from the fire.
11. 
Appellant does not appear to challenge the conclusion that his actions, whether 
leaving the room or falling asleep on the couch, were not a cause of the 
girls’ deaths. See id. § 6.04(a).